

FILED
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 2 5 2019

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

DEON VERNON                                                                PLAINTIFF

VS                          CASE NO: 3:19-cv-127-DPM

STEPHEN SIGMAN, Individually,                              DEFENDANTS
the CITY OF BLYTHEVILLE, ARKANSAS,
NATHAN KRUPIN, Individually, RONNIE MCSHAN,
Individually, and JOHN DOES 1-10, Individually

This case assigned to District Judge Marshall
and to Magistrate Judge Ray

## COMPLAINT

Come now the Plaintiff, Deon Vernon, by and through his attorney, the Morris W. Thompson Law Firm, P.A., and states and alleges as follows:

### INTRODUCTION

1.      This is an action brought under 42 U.S.C. § 1983 and other applicable federal statutes. Deon Vernon (Vernon) seeks redress against Stephen Sigman (Sigman), Nathan Krupin (Krupin), Ronnie McShan (McShan), and various unknown John Does, for their acts of commission and omission which were excessive in violation of his rights protected by the U.S. Constitution as well as federal laws. Furthermore, he seeks redress against the City of Blytheville, Arkansas (Blytheville or "the City"), for its policies, procedures, customs, and usages which were a proximate cause of his injuries and losses.

2.      Additionally, pursuant to its plenary power under 28 U.S.C. § 1367, Vernon seeks relief under Ark. Const. Art. 2 § 2. 2 § 6, 2 § 9, 2 §*15* redressable under the Arkansas Civil

1

Rights Act of 1993 (ACRA), codified at A.C.A. § 16-123-101 et seq.

## JURISDICTION AND VENUE

3. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1343(a)(3), the jurisdictional provision of 42 U.S.C. § 1983; original jurisdiction pursuant to 28 U.S.C. § 1331, federal question jurisdiction. Additionally, pursuant to 28 U.S.C. § 1367, this court has supplemental jurisdiction to hear and decide the pendant state claims under the Arkansas Constitution and laws redressable under ACRA.

4. All acts complained of occurred within the corporate limits of Mississippi County, Arkansas. Upon information and belief, at all relevant times, all parties were residents of Mississippi County, Arkansas. Consequently, venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

5. Vernon is, and was at all relevant times, a resident of Mississippi County, Arkansas.

6. Sigman was, at all relevant times, a canine officer with the Blytheville, Arkansas Police Department (BPD) assigned to the Patrol Division. All actions described of Sigman and complained of herein were in the capacity of a police officer with the BPD and under color of that authority.

7. Krupin was, at all relevant times, a patrol officer with the BPD. All actions described of Krupin and complained of herein were in the capacity of a police officer with the BPD and under color of that authority.

8. McShan was, at all relevant times, a Lieutenant and patrol officer with the BPD. All actions described of McShan and complained of herein were in the capacity of a police officer with the BPD and under color of that authority.

9. Upon information and belief, John Does 1–10 were, at all relevant times, employed with the BPD. The true names and capacities of said defendants sued herein as Does 1-10 are unknown to Plaintiff. Plaintiff will amend his Complaint to show their true names and capacities when the same are ascertained. Said designation represents any and all staff, employees, and agents of the BPD presently unknown who had any involvement in the actions or inactions proximately causing violations of Vernon's rights.

10. Blytheville is a local governmental subdivision of the State of Arkansas and as such is a person under 42 U.S.C. § 1983, the Arkansas Constitution and is amenable to suit thereunder.

## FACTS

11. On April 5, 2018, at approximately 2:33 am, Sigman, along with his canine, Niko, was sitting in an unmarked, blacked out vehicle on a stakeout for potential burglaries in the downtown area of Blytheville, AR.

12. Krupin was parked nearby also on stakeout for burglaries in downtown Blytheville.

13. After Vernon walked into Sigman's view, Sigman saw Vernon throw a rock into a store window and saw Vernon run away when the alarm sounded.

14. Sigman got out of his vehicle and yelled at Vernon to stop or he, Sigman, would

3

release his canine, Niko. Vernon continued to run and Sigman deployed Niko but had to call him back as Krupin had run between him and Vernon.

15. When Krupin was no longer in the way, Sigman commanded Niko to track. Several minutes later, Niko tracked Vernon to a position where he was lying prone on the ground among a massive entanglement of thorn bushes.

16. Where Vernon lay was within two fences. The first fence was a chain link fence through which the officers could see Vernon laying on the ground next to the fence. The second fence was a wooden privacy fence approximately 6 foot tall. The space between the fences was approximately seven (7) feet wide overgrown in an entanglement of massive thorn vines and bushes. See exhibits A and B attached hereto and incorporated herein.



Figure A

4



Figure B

17. Sigman was joined by several other officers, including McShan and Krupin, who shone their flashlights on Vernon and could see him through the chain link fence laying a few feet away on the ground.

18. Vernon was lying on his back with his hands on his chest. Sigman told Vernon to come on out or he'd send the dog over. Vernon placed his hands in the air, and told them "I'm done, I'm coming out".

19. As Vernon sat up to come out, Sigman began picking up the canine Niko as though to put it over the chain linked fence.

20. Vernon again yelled to the officers, "I'm coming out, I'm coming out, but Sigman put the dog over the fence on top of Vernon commanding it to attack Vernon. The canine latched onto Vernon's shoulder and began to bite him several times pulling Vernon through the thorn vines and bushes.

21. Vernon screamed in pain begging Sigman to get the dog off of him.

22. Over 30 times, Sigman commanded the dog to release Vernon but the canine failed to follow commands and continued to viciously maul Vernon.

23. Even as Vernon struggled to his feet by pulling on the fence for support, the canine maintained its hold on Vernon's, arm mauling Vernon continuously.

24. McShan climbed over the fence to take Vernon into custody, but Sigman told him not to as only he could approach Niko.

25. Finally, after approximately 3 minutes or more, Sigman climbed the fence, grabbed Niko by the collar and began to choke the dog off Vernon. Only when pulled off Vernon did Niko release its bite.

26. As a result of the vicious attack, Vernon was mauled by the dog for over 3 minutes and was left with permanent scarring and disfigurement as shown in figure C below.



Figure C

27.     All of the foregoing is captured on the body camera of one of the pursuing officers. See Exhibit 1 attached hereto and incorporated herein.

## FEDERAL CIVIL RIGHTS VIOLATIONS UNDER 42 USC § 1983

I.      4th AMENDMENT EXCESSIVE FORCE

28.     Vernon adopts by reference the allegations contained in paragraphs 5 through 27 above.

29. The canine attack was unreasonable and excessive. Once the canine located Vernon, it was no longer needed. It had done its job of tracking and locating Vernon.

30. Vernon lay flat on the ground, cooperating with the arresting officers. At no point did Vernon make a threatening move or motion at the officers.

31. Under the circumstances presented, it was not objectively reasonable for Sigman to believe that Vernon posed a threat to officer safety such that having the canine attack him as he lay on the ground. The force applied was not reasonably related to officer safety or safety of the public.

32. Furthermore, under the circumstances presented, it was not objectively reasonable for Sigman to believe that the level of force was reasonably related to or necessary to public safety. Vernon was prone on the ground, within two fences, and entangled in massive thorn bushes inhibiting his ability to make any movement.

33. Vernon's right to be free of excessive force and his right to bodily integrity were clearly established at the time and thus Sigman should have known to respect and safe guard those rights.

34. Sigman is not entitled to qualified immunity for his actions in that the contours of Vernon's rights were of long standing and well known.

II.   CITY OF BLYTHEVILLE - UNCONSTITUTIONAL POLICIES, PRACTICES, and CUSTOMS:

35. Vernon adopts by reference the allegations contained in paragraphs 5 through 34 above.

36. Ross Thompson (Thompson) was, at all relevant times, the Chief of Police and as

8

such he was the final policy and decision maker for the City with respect law enforcement and specifically regarding the training of handlers and service dogs.

37. Thompson was assisted in these duties and responsibilities by John Does 1 – 10 who were delegated with authority to set policy, procedure, and practices for the canine officers and canines in their charge. The following acts of commission and omission attributable to the John Does is pursuant the authority given them by Thompson and ratified by Thompson. Any and all decisions made by the John Does establishing policy and practices of the BPD and had the force and effect of law.

38. Thompson was not only responsible for the purchase of qualified trained canines, but once purchased, he was responsible for their ongoing training and supervision of their day-to-day usage.

39. Thompson was responsible for the qualifications and supervision of the handlers.

40. Sigman, and the K-9 officer before him, were not trained and certified K-9 handlers. Sigman was thus unqualified to work in this law enforcement capacity.

41. Thompson's decisions established policy for the City of assigning and retaining untrained and uncertified police officers as service dog handlers. This policy led directly to the constitutional and physical injuries Vernon suffered.

42. Thompson was aware that Sigman, and the canine handlers before him, were routinely involved in civilian contact and suspect apprehension as part of their assigned duties as patrol officers.

43. Considering frequent patrol encounters and involvement in suspect apprehension

with the potential for use of force, the need for specific training, particularly obedience training, was obvious to Thompson.

44. Thompson was aware that law enforcement canines have the potential for aggressiveness; and therefore, the use of police apprehension dogs required "adherence to procedures that properly controlled their use of force potential and that channel(ed) their specialized capabilities into legally acceptable crime prevention and control activities."

45. Thompson was aware of the need to utilize only those canines that have been examined by a licensed veterinarian authorized to conduct examinations and certify the physical and emotional (temperamental) condition of the canine that is utilized in public service as a police service dog.

46. Thompson was aware that because of the canine's potentiality for aggression and ability to effect severe injury by its bite:

   a. there needed to be an ongoing frequent training program for the K-9 officer and canine in order to insure the service dog's responsiveness to its handler;

   b. the police dog should release its hold on the suspect on a spoken command from its handler;

   c. that before a dog or handler can be placed on an "operational status" certain requirements must be met in order to ensure that the dog is certified to be competent and properly handled;

   d. that the canine and handler should be re-certified annually or as necessary by a qualified and certified K-9 police dog trainer; and

e. the canine should respond to the obedience commands of its handler as a control feature rather than as a competitive exercise.

47. A violation of a citizen's federally protected right to be free of unreasonable seizures is a highly predictable consequence of failure to train the canine officers to handle these recurring situations.

48. This lack of training left Sigman to his own discretion as how to handle Niko and how to handle situations as encountered that day and was a proximate cause of his use of excessive force.

49. Thompson's decisions were with forethought and knowledge that the likelihood that Niko would unnecessarily and unreasonably injure someone. These decisions were in derogation of Vernon's well-established rights and privileges protected by the 4th, and 14th amendments to the U.S. Constitution and federal laws.

50. There was no such training despite the obvious need. The failure was in deliberate indifference to a predictable outcome of a violation by excessive and unreasonable use of force.

51. As outlined in the preceding paragraphs, the City's policy of using service dogs to apprehend and attack unarmed, non-resisting, suspected misdemeanants such as Vernon, violated Vernon's right to be free of unreasonable thus excessive force.

52. Thompson was aware that the canine's natural potential for aggressiveness is heightened by the training it receives and thus continuous re-training is required to reinforce its obedience and responsiveness to its handler.

53. Despite his awareness of the likelihood Niko's fitness for duty would deteriorate

without ongoing evaluation and monitoring, Thompson made the decision not to monitor Niko's fitness for duty and its risk of unreasonable harm to citizens and suspects such as Vernon. This policy decision was a proximate cause of the deprivation of Vernon's constitutional rights.

54. Despite his awareness of the likelihood that Niko's fitness for duty would deteriorate without particularized on-going training reinforcing his obedience, Thompson chose not to establish regularly scheduled obedience training for Niko and monitor Sigman's adherence to said schedule. This policy decision was a proximate cause of Vernon's injuries and the deprivation of his constitutional rights.

55. Thompson's decision not to specifically train on suspect apprehension and arrest established the policy for Sigman and Niko.

56. Thompson's decision not to require ongoing and regular obedience training to prevent deterioration of the service dog's responsiveness to its handler established the policy for Sigman and Niko.

57. This lack of training left Sigman to his own discretion as how to train Niko and handle such situations and was a proximate cause of his use of excessive force.

58. These decisions were in derogation of Vernon's well established rights and privileges protected by the 14th amendment to the U.S. Constitution and federal laws.

59. The above recited acts and omissions of Defendants constitute a deprivation of Vernon's constitutional entitlement to due process guaranteed by the 14th Amendment to the United States Constitution. Such acts of Defendants while acting within the color of their authority are sufficient to invoke an action under 42 U.S.C. § 1983 against them for which

Vernon seeks damages as set forth herein below.

60. The City, as a municipality, is not entitled to qualified immunity and is separately liable for its policies, usages, customs, practices, established by Thompson's decisions as the final decision and policy maker for the City which have the force and effect of law.

III. 14TH AMENDMENT DUE PROCESS CLAIM

61. Vernon adopts by reference the allegations contained in paragraphs 5 through 60 above.

62. Sigman put the dog on Vernon and commanded it to attack out of spite and malice because Vernon had fled and did not come to the fence as fast as Sigman wanted.

63. Sigman put the dog on Vernon and commanded it to attack out of spite and malice to force Vernon to move as quickly as Sigman wanted.

64. Vernon's liberty interest in his bodily integrity and right not to have it violated by arbitrary government action is protected by the due process clause of the 14th Amendment; and was clearly and well established for more than two decades prior to the complained of incident.

65. Sigman's purposeful, knowing, and deliberate use of the canine to seize Vernon was arbitrary and unrelated to any legitimate governmental interest.

66. Sigman's use of the canine to attack and inflict pain on a helpless, non-threatening suspected misdemeanant lying prone on the ground entangled in massive thorn bushes within two fences that prevent his escape shocks the conscious and is not to be tolerated in a civilized society.

67. As a result of the foregoing Sigman is not entitled to qualified immunity.

IV.    CONSPIRACY TO VIOLATE VERNON'S RIGHTS

68.    Vernon adopts by reference the allegations contained in paragraphs 5 through 66 above.

69.    Following the arrest, Krupin and McShan got together to write their reports in such a way to justify Sigman's actions and the use of force by the canine, knowing that their written versions were false and did not comport with what actually happened.

70.    Their acts, omissions, were in consort/conspiracy and interfered with or attempted to interfere with and violate Vernon's clearly established rights to be free of excessive and unreasonable force, and the right to enjoy and defend life and liberty.

71.    As a result of the foregoing, neither Krupin nor McShan are entitled to qualified immunity for their actions or inactions.

V.    STATE LAW CLAIMS

72.    Vernon adopts by reference the allegations contained in paragraphs 5 through 71 above.

73.    The above described actions were in derogation of Vernon's well established rights and privileges protected by the Ark. Const. Art. 2 § 2. 2 § 6, 2 § 9, 2 §*15* redressable under the Arkansas Civil Rights Act of 1993 (ACRA*)*, codified at A.C.A. § 16-123-101 et seq.

74.    This action violated Vernon's rights, privileges, and immunities secured by the Arkansas Constitution and laws thereunder.

75.    Vernon had a right to be free of unnecessary and needless harmful and offensive contact.

VI.                                              DAMAGES

76. As a natural and foreseeable result of said acts of Defendants, Vernon suffered extreme pain and suffering, past, present and future, severe emotional distress, public humiliation, and permanent scarring and disfigurement. For these acts, injuries and losses Vernon seeks damages as set forth below.

77. For the acts, omissions, customs and policies complained of herein, Vernon seeks the following relief:

    a. Compensatory and punitive damages for violation of his constitutional rights redressable under 42 U.S.C. § 1983;

    b. Compensatory and punitive damages for violations of his rights protected by the Arkansas Constitution redressable under the ACRA;

    c. Damages for pain and suffering, past, present, and future;

    d. Damages for emotional distress;

    e. Damages for humiliation and public embarrassment;

    f. Damages for permanent scarring and disfigurement;

    g. Reasonable Attorney's fees and costs;

    h. All other damages to which he is entitled under § 1983 and the ACRA, federal, and state laws.

78. Vernon reserves the right to amend and plead further as subsequently discovered evidence warrants.

79. **PLAINTIFF DEMANDS A JURY TRIAL**

WHEREFORE, Deon Vernon requests judgments against the Defendants, jointly and severally, for violation of his rights protected by the United States Constitution redressable under 42 U.S.C. § 1983; and, Ark. Const. Art. 2 § 2. 2 § 6, 2 § 9, 2 §*15* redressable under the Arkansas Civil Rights Act of 1993 (ACRA*)*, codified at A.C.A. § 16-123-101 et seq..  Furthermore, Deon Vernon seeks judgment for compensatory damages for the violations of said rights as well as the pain and suffering and mental anguish, and permanent scarring and disfigurement; for punitive damages; for reasonable attorney's fees and costs; and for all other just and proper relief in the premises.

> Respectfully submitted for
> Deon Vernon, plaintiff herein
>
> *[signature]*
>
> Morris W. Thompson Law Firm, P.A.
> P. O. Box 662
> Little Rock, AR  72203
> Tele: (501) 661-8100
> Fax:  (501) 663-3544
> Email: mwthompsonlaw@sbcglobal.net
> ABN: 80145